178 N.J. Super. 499 (1981)
429 A.2d 596
JANE DOE (A FICTITIOUS NAME), A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, MARTHA FISHER AND MARTHA FISHER, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 5, 1981.
Decided March 25, 1981.
*500 Before Judges ALLCORN, KOLE and PRESSLER.
Shannon Z. Taylor argued the cause for appellants (D'Alessandro, Sussman, Jacovino & Dowd, attorneys; Paul J. Hirsh, on the brief).
Paulette M. Sapp, Deputy Attorney General, argued the cause for respondents (John J. Degnan, Attorney General, attorney; Erminie L. Conley, Assistant Attorney General, of counsel).
The opinion of the court was delivered by ALLCORN, P.J.A.D.
The present action was commenced by plaintiffs seeking damages for an asserted physical assault and rape committed against plaintiff Jane Doe while she and her alleged assailant were residents of Ewing Residential Center, a DYFS facility. The cause of action sounds in negligence, asserting that plaintiff's injuries resulted from the failure of defendants adequately to supervise the residents of the facility and their failure to take *501 proper precautions for plaintiff's safety. On motion, the trial judge granted the application of defendants for summary judgment on the ground that, under the Tort Claims Act, the State, its agencies and employees are not liable for damages arising from "any injury caused by ... a prisoner to any other prisoner." N.J.S.A. 59:5-2 b(4). Plaintiffs appeal.
The record reveals that in 1974 the parents of the minor plaintiff entered into an agreement with the predecessor agency of DYFS requesting foster care for plaintiff and two other children. Thereafter, although placed in a number of foster homes, plaintiff ran away and refused to stay in individual foster homes. As a result, a proceeding was ultimately initiated against plaintiff by DYFS in the Morris County Juvenile and Domestic Relations Court. After a hearing plaintiff was adjudicated a juvenile in need of supervision (JINS) and was remanded to the Youth Shelter pending exploration of residential placement. A subsequent hearing resulted in the placement of plaintiff in Ewing Residential Center. The Center is a group foster home  a residential facility for "hard to place" children, who are emotionally disturbed or socially maladjusted. It was during her stay at the Center that the asserted assault and rape occurred. The alleged perpetrator concededly was also a resident at the Center by virtue of his adjudication as a JINS and an order of placement to the Center.
The single issue raised on this appeal is whether the minor plaintiff (as well as her alleged assailant) was a "prisoner" within the contemplation of that term as used in N.J.S.A. 59:5-2 b(4). The cited subsection provides:
Neither a public entity nor a public employee is liable for:
........
b. Any injury caused by:
........
(4) a prisoner to any other prisoner.
By common definition, "[a] `prisoner' is a person deprived of his liberty by virtue of judicial or other lawful process." 60 *502 Am.Jur.2d Penal and Correctional Institutions, § 1 at 808. A juvenile who, in an appropriate proceeding in the Juvenile and Domestic Relations Court, has been adjudicated a JINS and who, by order of that court, has been committed to a youth facility such as the Center  a group foster home operated by the State (DYFS) to provide care and supervision for those youths committed to it  is "in the custody of the person in charge of the ... [facility] and is not free to come and go at will." State in the Interest of M.S., 73 N.J. 238, 244 (1977). He or she has been committed to the custody of the person in charge of the juvenile facility and is there under a restraint against leaving voluntarily. Such juvenile is thus deprived of his or her liberty by virtue of judicial process issued in and as the result of a judicial proceeding.
We recognize, of course, that a JINS in custody at such a juvenile facility is not a "prisoner" in the sense of being an inmate of State Prison or some other state or county penal establishment. Indeed, it is of some significance that the Legislature utilized the term "prisoner" in the statutory context, rather than the designation "prison inmate." See, e.g., White v. Lewis, 156 N.J. Super. 198 (App.Div. 1978).
Of even greater significance is the fact that our Tort Claims Act was modeled upon the California tort claims statute (Cal. Government Code § 810 et seq.), which undoubtedly was subjected to thorough study by the members of our Legislature before the adoption of the New Jersey statute. Section 844.6(a)(2) of the California Government Code provided that a public entity should not be liable for "[a]n injury to any prisoner." In defining the term the California Legislature stated that "`prisoner' includes an inmate of a prison, jail or penal or correctional facility." The Legislative Committee comment to that section sets forth in so many words that the immunity so provided makes the public entity "immune from liability for injuries to prisoners (which includes wards of the juvenile court)...."
*503 Indeed, the very issue now before us was presented to the California courts in Jimenez v. Santa Cruz Cty., 42 Cal. App.3d 407, 116 Cal. Rptr. 878 (D.Ct.App. 1974). It was there held that the statutory proviso immunized the public entity against any tort claim by reason of the drowning death of a juvenile who, at the time of the occurrence, had been judicially declared a ward of the juvenile court and committed to a group foster home facility. The California court determined that the juvenile was a "prisoner" within the comprehension of the immunity statute by reason of the fact that "a ward of the juvenile court, committed to a place of custody such as a foster home, is `one involuntarily restrained,' `one who is in custody as the result of a legal process' and one `deprived of his liberty by virtue of a judicial ... process.'" Id. at 410, 116 Cal. Rptr. at 879. The court concluded that, in the circumstances, the juvenile was a "prisoner" in the custody of the director of the foster home facility, even though "the drowning occurred while the director of the home had taken the juvenile on a vacation trip with other inmates of the home." Id. at 412, 116 Cal. Rptr. at 881.
We are not unmindful of the policy and purposes of the legislation dealing with JINS and juvenile delinquents, "to provide for the care, protection, and wholesome mental and physical development of juveniles coming within the provisions" of the act. N.J.S.A. 2A:4-42(a). Nothing in the purpose or terms of the act dealing with juveniles, however, imposes liability upon the State, explicitly or implicitly when a juvenile committed to its custody by order of a Juvenile and Domestic Relations Court is injured by the intentional act of another juvenile while both are in custody.
N.J.S.A. 59:5-1 sets forth plainly and unambiguously the underlying policy and purpose of the Tort Claims Act in this area. That section provides:
Neither a public entity nor a public employee is liable for failure to provide a prison, jail or penal or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel or facilities in a prison or other correctional facility.
*504 Fundamentally, N.J.S.A. 59:5-1 et seq. recognize the accepted principle that the allocation of the limited funds available to the State and other public entities for equipment and personnel in the administration, supervision and operation of custodial facilities to which prisoners are committed "involves the type of governmental policy determinations which must remain free from the threat of tort liability." Comment to N.J.S.A. 59:5-1.
Hence we discern no real conflict between the purposes and policies of the two statutes. They speak to separate and independent subjects and concerns. But, even upon the dubious assumption that some general conflict does exist, the specific immunization contained in N.J.S.A. 59:5-2 b(4) must control. This conclusion receives added support from the immunization of the State and other public entities against similar liability in the case of persons suffering from mental illness. In the face of the obvious concern and policy of the Legislature for the care, custody and protection of persons affected with mental illness (see, e.g., N.J.S.A. 30:4-24, 24.2), here, too, the Legislature has immunized the State and public entities against liability for injury "caused by any person who has been confined for mental illness ... upon any other person so confined," N.J.S.A. 59:6-7(b). Thus, we perceive no bases in reason or logic for construing the statutory section here in question as being inapplicable to a JINS.
In light of all the foregoing we are convinced that the Tort Claims Act bars a cause of action against the State or other public entity or public employees for an injury occurring to a JINS while committed to and in custody of a group foster home facility, which injury is caused by another JINS so committed to and in custody at the same facility.
Accordingly, the judgment of the Law Division is affirmed. No costs.
PRESSLER, J.A.D. (dissenting).
I am constrained respectfully to dissent. In my view a juvenile adjudicated in need of supervision (JINS) and placed in *505 a residential facility operated by the Division of Youth and Family Services is not by reason of that placement a prisoner within the exclusionary intendment of the Tort Claims Act.
I start from the premise that when the Legislature adopted the Tort Claims Act in 1972 and more particularly chapter 5 thereof, entitled "Correction and Police Activities" (N.J.S.A. 59:5-1 to 59:5-5 inclusive), it had no specific intent in respect of a JINS since it did not create that category until 1973. See N.J.S.A. 2A:4-45 (L. 1973, c. 306, § 4). The question then, as I see it, is to determine whether the legislative intent in enacting the corrections and police-activity exemptions of the Tort Claims Act reasonably encompasses, either as a matter of statutory language or public policy, the subsequently enacted JINS status. It is my further view that this question must be answered negatively.
Addressing first the question of statutory language, I am satisfied that the word "prisoner," as used by N.J.S.A. 59:5-2, is not, as the majority suggests, statutorily undefined. Rather, it seems to me that its substantive content is afforded by N.J.S.A. 59:5-1, whose definitional scope extends to all of chapter 5. As the majority has observed, N.J.S.A. 59:5-1 "sets forth plainly and unambiguously the underlying policy and purpose of the Tort Claims Act in this area." At 503. I agree with that observation. I point out, however, that N.J.S.A. 59:5-1 speaks only to "a prison, jail, or penal or correctional facility." Thus, I am satisfied that one can be regarded a prisoner for purposes of the act's exemption scheme only if one is confined to or is an inmate of such a facility.
I am also satisfied that it would be entirely antithetical to the entire JINS concept to classify as a correctional facility a DYFS residential facility for "hard-to-place" children who are "emotionally disturbed or socially maladjusted." At 501. That proposition is made perfectly plain by our Supreme Court in State in Interest of M.S., 73 N.J. 238 (1977), which carefully and pointedly distinguished between the JINS and delinquency status. *506 This distinction relates not only to the juvenile's needs and problems and the societal consequences of his behavior, but also to the nature of the facility in which the juvenile may be housed. Plainly and simply, the JINS facility, whether for purposes of shelter care or post-adjudication placement, is a in loco parentis situation and not a penal or correctional one. As is specifically provided by N.J.S.A. 2A:4-62(b),
No juvenile in need of supervision shall be committed to or placed in any institution or facility established for the care of delinquent children or in any facility, other than an institution for the mentally retarded, a mental hospital or facility for the care of persons addicted to controlled dangerous substances, which physically restricts such juvenile committed to or placed in it.
Finally, I find absolutely conclusive the fact that the Supreme Court in State in Interest of M.S., supra, rejected the thesis that a JINS could be guilty of conduct constituting an escape in violation of former N.J.S.A. 2A:104-6. That statute defined the crime of escape in terms of imprisonment or detention in a place of confinement, or being in the custody or control of a penal or correctional institution. If a JINS facility is neither a place of confinement nor a penal or correctional institution for purposes of the crime of escape, I do not perceive how it can become one solely for the purposes of N.J.S.A. 59:5-1. The definition of the crime of escape provided by the 1979 Code of Criminal Justice is, moreover, even clearer in its exclusion of the JINS situation. N.J.S.A. 2C:29-5 expressly includes, in its listing of places of "official detention," facilities for persons found to be delinquent. Its failure to include JINS facilities as well can leave no doubt that the Legislature was not only in accord with the Supreme Court's views as expressed in State in Interest of M.S., supra, but also that it intended to adhere to its original noncorrectional view of a JINS facility as expressed by N.J.S.A. 2A:4-62(b), quoted supra.
I am further persuaded that not only the statutory language but also considerations of public policy lead inexorably to the conclusion that a JINS is not a prisoner for purposes of the exemption of the Tort Claims Act. The general exemption afforded in respect of the correctional activities of the State is *507 obviously based on the legislative perception that the State, in these activities, is dealing with a uniquely high-risk situation which it is virtually impossible to control by the exercise of reasonable diligence alone. Persons convicted of crime or adjudicated delinquent on the basis of conduct which would be criminal but for the age of the perpetrator have already demonstrated some degree of antisocial propensity and disregard for the civilizing demands of the social contract. The risk of such persons being involved, even while in custody or as a result of custody, in actions causing physical injury and property damage to others is self-evidently higher than one would expect from the general population at large. It is obviously necessary for the State to be able to formulate and execute, within reasonable budgetary constraints, a sound and rational correctional and penal policy without being burdened by the general prospect of tort liability which might otherwise result as a consequence of the conduct of inmates towards each other. It might also be suggested that at least some of these considerations apply as well to committed mental patients whose commitment necessarily rests upon the finding of their dangerousness. See, e.g., R. 4:74-7(f).
None of these considerations applies, however, to the JINS situation. These are youngsters who, as is pointed out by State in Interest of M.S., supra, 73 N.J. at 243, are not guilty of antisocial conduct but only of offenses "against his or her own best interests." The purpose of the post-adjudication placement is accordingly neither penal nor correctional in nature. It is rather essentially parental and is designed to afford a troubled youngster with the kind of guidance, supervision and other assistance which his own parents, if he has any, are unwilling or unable to provide for him. Thus, we are dealing here with residential alternatives, not with correctional ones. It seems to me, moreover, to be insupportably anomalous to conclude that the State can exercise the in loco parentis role and yet not be required to do so with reasonable care. Indeed, the whole purpose of the JINS placement is to provide a presumptively *508 safe, protected and constructive residential environment for youngsters whose own homes are inadequate. The State, having undertaken to fulfill that obligation to these children, should not, in my view, be exempt from the normal consequences of a failure to exercise reasonable care in doing so. It certainly should not be so exempted in the absence of a clear legislative directive so requiring.
To the extent that the California courts have held contrarily, I am constrained to reject their reasoning.
I would reverse the summary judgment and remand for trial on the issues of liability and damages.