235 N.J. Super. 47 (1989)
561 A.2d 631
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT J. MARTIN, III, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 24, 1989.
Decided July 7, 1989.
*48 Before Judges KING, BRODY and ASHBEY.
*49 Daniel J. Carluccio argued the cause for appellant (Carluccio & Liston, attorneys; Daniel J. Carluccio, of counsel; Joseph Pinizzotto, on the brief).
Carol M. Henderson, Deputy Attorney General, argued the cause for respondent (Peter N. Perretti, Jr., Attorney General, attorney; Linda A. Rinaldi, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by ASHBEY, J.A.D.
The principal holding in this appeal is that a supervisor in a juvenile shelter engaging in sexual conduct with a juvenile resident in the shelter is guilty of the crime of sexual assault under N.J.S.A. 2C:14-2c(3) and that the juvenile's "consent" is not a defense.
Defendant was found guilty of two counts of second-degree sexual assault, contrary to N.J.S.A. 2C:14-2c(3); one count of second-degree official misconduct, contrary to N.J.S.A. 2C:30-2a, and one count of fourth-degree sexual contact, contrary to N.J.S.A. 2C:14-3b. He was acquitted of two other counts of sexual assault, and sentenced to concurrent seven-year terms for the assaults and official misconduct and to a concurrent 18 month term for sexual contact. A $120 Violent Crimes Compensation Board penalty was imposed. Defendant appeals and we affirm.
On appeal defendant contends:
Point I
The evidence was insufficient to sustain convictions under N.J.S.A. 2C:14-2c(3) or N.J.S.A. 2C:14-3(b).
Point II
The trial court erred in instructing the jury that consent was not a defense.
Point III
The trial court inappropriately sentenced the defendant to a custodial term.
Point IV
The court erred in not sentencing defendant as a third degree offender.
*50 In large measure the facts were undisputed. Mary,[1] a seventeen-year-old adjudicated delinquent, was required to live in the Ocean County Children's Shelter (Shelter) as a condition of probation under N.J.S.A. 2A:4A-43b(3).[2] Defendant was employed by the county as a detention officer/youth aide with supervisory duties at the Shelter.
Mary testified that on February 6, 1986, while she was a probationer living at the Shelter under the Family Part order, defendant invited her to go with him to pick up another resident. At that time defendant asked her to perform fellatio, which she did. She said he made her promise not to tell anyone because "he could lose his job." After they returned to the Shelter, defendant fondled her breasts and asked her to touch his groin area. On February 17 and February 19 defendant had sexual intercourse with Mary at the Shelter. These were brief encounters in which defendant stood Mary against the bedroom wall while ostensibly opening and closing locks so she could shower. On February 20, 1986, Mary told the Shelter's psychologist about the incidents.
Defendant testified that on February 17 he was not on duty, he was only visiting the Shelter. He did not deny that the sexual events took place. He claimed Mary said to him, "I want you, I want to be with you, I like you. You're good looking." He said she made sexual suggestions and fondled him. He admitted that on February 6 he exposed himself and that she did perform fellatio, although he said she began the sexual encounter. He said that on February 17 and February *51 19 she fondled him and they had the brief episodes of intercourse to which Mary testified.
The jury found him not guilty of the charges stemming from the February 17 charge of intercourse when he was not on duty and of another charge of digital penetration on an unspecified date, but guilty of sexual assault respecting the February 6 fellatio, the February 19 intercourse, as well as guilty of sexual contact and official misconduct.
N.J.S.A. 2C:14-2c(3) provides:
An actor is guilty of sexual assault if he commits an act of sexual penetration with another person under any of the following circumstances:
* * * * * * * *
(3) The victim is on probation or parole, or is detained in a hospital, prison or other institution and the actor has supervisory or disciplinary power over the victim by virtue of the actor's legal, professional or occupational status....
Defendant first argues that the State failed to prove one of the critical elements of N.J.S.A. 2C:14-2c(3), namely, that Mary was "detained" because she was free to leave the Shelter. The State's first answer to this argument is that because Mary was on probation, her detention was not a necessary element of the crime. The judge rejected the State's position, ruling that a crime based on Mary's probationary status would require that defendant be her probation officer.
We need not rule on this question of statutory interpretation because defendant was not convicted of the crime as so defined. Although it is conceded that defendant had supervisory power over Mary who was on "probation" as a resident of the Shelter, the N.J.S.A. 2C:14-2c(3) theory of the crime presented to the jury turned on the element of whether Mary was "detained."
In support of its claim that Mary was "detained," the State presented evidence that while she was free to leave the Shelter, which was not locked to the outside, she could do so only under the Shelter's rules. If she had left without permission, she would have been reported "AWOL" to the Ocean County Sheriff's Department and returned to the Shelter. Inside the Shelter *52 she was subject to rules and regulations enforced by staff members. Doors to the bedrooms and the kitchen, when not in use, were locked. The hallway door which led to the upstairs portion of the Shelter is also locked. Shelter residents were required to abide by the rules and regulations and were disciplined. The Shelter had a "furlough" program which defined the terms under which any resident could leave for more than a short period of time. Those circumstances contrasted with those of the Ocean County Detention Center, which was a secure, locked facility.
Defendant relies on certain statutory definitions to establish that, as a matter of law, Mary was not "detained." "Detain" is not statutorily defined, but "detention" is defined as "the temporary care of juveniles in physically restraining facilities pending court disposition." N.J.S.A. 2A:4A-22c. It was undisputed that Mary was not in "detention" under that statute. The State also concedes that Mary would not have been guilty of "escape" had she left the Shelter without permission.[3] Defendant also relies upon cases construing prior law that a juvenile who left a shelter without permission was a juvenile "in need of supervision" (JINS), not a delinquent, and could not be placed in custody. State in Interest of M.S., 73 N.J. 238, 243 (1977).[4] (In M.S. the Court also held that a JINS "placed in a shelter care facility obviously is in the custody of the person in charge of the shelter and is not free to come and go at will," id. at 244, and that those in charge of a shelter facility stand in loco parentis, id. at 246. Cf. State v. Clay, 230 N.J. Super. *53 509, 524-525 (App.Div. 1989); State v. Reyes, 207 N.J. Super. 126, 144 (App.Div. 1986), certif. den. 103 N.J. 499 (1986); Doe v. Division of Youth & Family Services, 178 N.J. Super. 499, 505 (App.Div. 1981), rev'd on dissent 89 N.J. 284 (1982). These cases illustrate the characteristics and consequences of a finding respecting adult and juvenile custodial status in other contexts and do not apply here.
Our purpose is to derive the intent of the law in question. The word "detain" must be accorded its fair import. N.J.S.A. 2C:1-2c. We do not equate the meaning of "detain" in N.J.S.A. 2C:14-2c(3) with "detention" in the delinquency law, N.J.S.A. 2A:4A-22c, or with "official detention," under the Criminal Code, N.J.S.A. 2C:29-5. We first observe that Black's Law Dictionary defines "detain" as "to hold; to keep in custody," and "detention" as "[h]olding one arrested on a charge of crime." Blacks Law Dictionary 343 (3 ed. 1969).
There is also a complete legislative history behind N.J.S.A. 2C:14-2c(3). Prior to the advent of the Criminal Code, the crime was limited to inmates of certain institutions. The law provided:
Any person who has carnal knowledge of a female inmate of any home or institution for feeble-minded or mentally ill females, or of any home or training school for the feeble-minded, with or without her consent, is guilty of a misdemeanor. [N.J.S.A. 2A:138-2]
In The New Jersey Penal Code, Volume II: Commentary, Final Report of the New Jersey Criminal Law Revision Commission (1971) (Commentary), the Commission recommended, as part of its overall criminal code changes respecting sexual offenses, that this law be expanded as to victims and narrowed as to defendants. It proposed the following relevant section:
A male who has sexual intercourse with a female not his wife, or any person who engages in deviate sexual intercourse or causes another to engage in deviate sexual intercourse, is guilty of an offense if:
* * * * * * * *
(3) the other person is in custody of law or detained in a hospital or other institution and the actor has supervisory or disciplinary authority over him. *54 [The New Jersey Penal Code, Volume I: Report and Penal Code, Final Report of the New Jersey Criminal Law Revision Commission (1971) at 62 (proposed as N.J.S.A. 2C:14-3)]
The Commentary said:
Where women are in custody, coercion and abuse of authority can easily be present.[5] On the other hand, it must be recognized that institutionalized women may freely and competently seek sexual relations with available males, whether casual visitors, fellow-inmates, or members of the custodial group. The prevention of such intercourse may be a proper objective of the criminal law, but it is entirely too undiscriminating to lump all such cases together for the severe punishment appropriate to forceful rape. That is the policy now pursued by our law under N.J.S. 2A:138-2 which grades the offenses as a misdemeanor. The provision in the Code is limited to personnel having "supervisory or disciplinary authority" over the victim. [Commentary at 198-199]
Although Cannel indicates that the Legislature rejected much of the proposed Commission's sexual offense sections as too narrow, (Cannel, Title 2C Comment N.J.S.A. 2C:14-1 et seq. at 296), by enacting N.J.S.A. 2C:14-2c(3), the Legislature clearly used the word "detain" from the Commission's language to cover both victims being "in custody of law" and victims being "detained in ... [an] institution."
Elsewhere in the statute N.J.S.A. 2C:14-2c(4) provides that an actor is guilty of sexual assault if he commits an act of sexual penetration and
[t]he victim is at least 16 but less than 18 years old and the actor is a member of the victim's household with supervisory or disciplinary power over the victim....
We consider this provision in pari materia (Bienan, supra, at 181) and relevant to ascertaining the Legislature's meaning respecting the preceding section. State v. Wasserman, 75 N.J. Super. 480, 488 (App.Div. 1962), aff'd 39 N.J. 516 (1963); 2A *55 Sutherland, Statutory Construction (4 ed. 1984), § 46.05 at 90.
Prior to July 7, 1983, N.J.S.A. 2C:14-2c(3) included as victims persons who were "mentally defective" (the central purpose of N.J.S.A. 2A:138-2 which N.J.S.A. 2C:14-2c(3) replaced). Subsequently, the Legislature made a separate crime of sexual assaults on such victims; see N.J.S.A. 2C:14-2c(2). In the legislative history attached to this amendment, the Legislature recognized that N.J.S.A. 2C:14-2c(3) eliminated any requirement of force or coercion in these sexual assaults, so long as the defendant was in a supervisory or disciplinary position over the victim. See L. 1983, c. 249.
This legislative history demonstrates that the Legislature has continually expanded the category of victims whose status is an element of the crime and emphasized the element of supervision as the dominant criminal element in the actor's proscribed conduct. Examining the pre-Code law, the Commission's proposed law (and the accompanying Commentary), the original Code definition and its amendment, we are satisfied that the Legislature, in using the word "detain" in an "institution" or in a "hospital" did not intend to limit "detain" to "being in custody."
Moreover, Mary's testimony comparing the Detention Center with the Shelter was eloquent in describing the nature of the restraint. "To me it was the same, because I wasn't home. That's all I wanted." Defendant also testified that on February 19 he had to unlock four locks for Mary, the lock to the stairs, the linen closet, her room, and her locker just so she could take a shower. That procedure was necessary for every shower. It was undisputed that the "disciplinary reports" of her supervisors, such as defendant, could prevent her from obtaining weekend furloughs to see her child. While Mary's age was not an element in the crime, her age and status as a *56 juvenile offender were relevant to the control the Shelter had over her. It cannot be doubted that if she had disregarded the instructions of her supervisors, she would have been subject to a charge of a violation of her probation. We find no error in the court's refusing to rule that Mary was not "detained" as a matter of law and ample evidence to support the jury's finding that she was "detained."
Defendant next asserts that the trial judge erred in not instructing the jury that consent was a defense to the offense charged. Defendant relies on N.J.S.A. 2C:2-10a which provides that,
The consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense if such consent negatives an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense.
Defendant concedes that force is not an element of the crime, but asserts that Mary's consent precluded the "harm or evil sought to be prevented by the law defining the offense."[6]
The trial judge instructed the jury as follows:
... it doesn't matter whether she consented to have sex if she was detained. And it doesn't matter if  if she came on to him as he [defendant] says.... It doesn't matter if she was detained, because this Statute is aimed at preventing people in positions of authority in an institution from having their way, even with the inmate's consent, with an inmate in there. So it doesn't matter.
Contrary to defendant's position, we find this statement accurately conveyed the law. N.J.S.A. 2C:14-2c(3), seeking to prevent sexual relations between a custodian and a detainee, reasonably recognized the unequal positions of power and inherent coerciveness of the situation which could not be overcome by evidence of apparent assent. See Commentary, supra, at 198-199; N.J.S.A. 2C:14-2a(1), -2a(2), -2b, -2c(4) and *57 -2c(5); see also Cannel, Title 2C, Comment N.J.S.A. 2C:14-5 at 313. We have already noted the history of the Legislature's expansion of the elements of this crime. We recognize that Cannel expressed doubt concerning whether the Legislature intended to make consent irrelevant or to provide that there was a conclusive presumption of non-consent. Id. at 314. Legislative history and statutory plain meaning leave us in no doubt that the Legislature determined that if someone in Mary's position was "detained," she was legally incapable of giving knowing and free consent to proscribed sexual conduct with the supervisors who held power over her.
Moreover, the circumstances of this case amply illustrate the reasonableness of that assumption. One of the Shelter privileges testified to as sought after by Shelter residents was that of being permitted to leave the premises with a staff member. Defendant testified that on February 6 Mary had permission to leave with him no fewer than three times, on one of which he bought the people in his control ice cream; on the last of which she was alone with him and fellatio occurred. He testified she said she was lonely. The relationship as understood by Mary between sex and institutional favors was testified to by a defense witness. Robert Comellas said, "she made the statement that ... if I would feed her, she would even have sex with me." He also testified Mary was concerned that her behavior would cost her privileges. "Are you going to take points off ...?" she asked. The February 19 incident preceded Mary's church counseling which Mary said had "to do with sexual matters." Her Shelter record indicated that she was "an abused child" and there was evidence of suicidal gestures. We find no error in refusing to charge the jury that consent was a defense.
Defendant's further contention that the trial court erred in not charging that Mary's consent was a defense to the charge of his misconduct in office is equally without merit. It was *58 uncontradicted that defendant's sexual relations with Mary was a violation of his duties as a youth aide. He admitted as much. N.J.S.A. 2C:30-2a.
Defendant next challenges his sentence. The judge imposed an aggregate concurrent presumptive seven year term for three second-degree crimes and a concurrent one and one-half year term for the fourth-degree sexual contact.[7] Defendant recognizes that the judge need not have found that aggravating factors exceeded mitigating in order to impose a presumptive term. He contends that the trial court inappropriately sentenced him to a custodial term as a second-degree offender when he should have been sentenced as a third-degree offender because the aggravating factors were "virtually nonexistent." Contrary to his contention, we do not find defendant's circumstances "truly extraordinary." State v. Roth, 95 N.J. 334, 358 (1984).
In his reasons the judge referred to the psychological frailty of the victim and that a lesser sentence would depreciate the seriousness of defendant's offense because he had a position of public trust. The judge considered most important the need to deter other people with similar positions.
We recognize that the first two factors might appear inherent in the crime. We have recited some of Mary's personal circumstances making her more vulnerable than if she were simply "detained." There was other evidence. Mary testified that when she first met defendant he was "[v]ery nice" and "[r]espectful," during the month and a half she was in the Detention Center. She said that prior to the February 6 incident defendant came in to visit her while she was sick. He used the occasion to compliment her. Defendant admitted coming in "to *59 check on her, see how she was doing." When asked why she did not report the first sexual incident immediately, Mary said,
... I felt like from the beginning, I felt like anybody that worked there was a person, you know. I should have  is all respect. I treated everybody with respect, you know, any staff that worked there. And I felt like they were there to listen to your problems and you know, help you out with anything.
* * * * * * * *
... I felt like I had to keep a promise for him, you know, he told me to promise him not to ever tell anybody what was going on....
The trial included testimony that Mary was known to be at risk of "self-injury ... because she had a tendency to do something wrong and have tremendous, tremendous remorse and guilt feelings." She was particularly at risk for sexual approach. It was a fair inference from the record that defendant knew Mary's history. He was familiar with her file. Of Mary's detention behavior, defendant said, "she was always trying to get at the boys or trying to be with the boys...." He also said that at times she was depressed. Respecting the February 6 incident defendant first said Mary was provocative at the Shelter and he was "shocked." Elsewhere, he said it was her "normal way." Despite his asserted reluctance after February 6, it was defendant who went to the Shelter while off-duty on February 17. Defendant's attitude could be summed up in his own testimony. He was asked, "You  you could have walked away from that situation, couldn't you have? A. So she could have walked away, too." We do not consider the judge's reference to Mary's frailty a duplication of the elements of the crime.[8]
General deterrence has recently been given a relatively insignificant value as a sentencing reason, see State v. Jarbath, 114 *60 N.J. 394, 405 (1989); State v. Gardner, 113 N.J. 510, 520 (1989), but it was undisputed that this incident had been investigated by a Criminal Justice Unit because of similar "grave problems in institutions ... of institutional abuse." Deterrence of others remains a proper sentencing reason. N.J.S.A. 2C:44-1a(9).
Respecting defendant's assertion that he should have received a non-custodial sentence, the judge carefully weighed the statutory criteria respecting presumptive imprisonment, quoting the statute that "unless, having regard to the character and condition of the defendant, if the Court is of the opinion that his imprisonment would be a serious injustice which overrides the need to deter ... such conduct by others." See N.J.S.A. 2C:44-1d. He concluded that defendant had not met this burden. He also concluded that defendant did not meet the criteria for down-grading the offense. N.J.S.A. 2C:44-1f(2).
Under N.J.S.A. 2C:44-1d there was a presumption of imprisonment, not readily overcome. State v. Kelly, 97 N.J. 178, 219 (1984). We cannot conclude that the judge abused his discretion in finding that no serious injustice required the downgrade which defendant urged or a non-custodial sentence. See State v. Jarbath, 114 N.J. at 413. Defendant's reliance on State v. Daniels, 195 N.J. Super. 584 (App.Div. 1984), is misplaced.
We recognize that in State v. Hodge, 207 N.J. Super. 363, 367 (App.Div. 1986), certif. den. 105 N.J. 518 (1986), we downgraded defendant's sentence as a first-degree offender, sua sponte. There we relied on certain portions of defendant's Adult Diagnostic and Treatment Center (Avenel) report (id. 207 N.J. Super. at 369), the pre-sentence investigation, disparity in defendant's prior sentencing (id. at 366), disparity in the sentencing of similar offenders (id. at 370, and rejected a sentence of fifteen years. These circumstances are not here duplicated. See State v. Roth, 95 N.J. at 365.
Affirmed.
NOTES
[1] For purposes of confidentiality, we have changed her name.
[2] Mary's order of disposition provided that she was committed to the Department of Corrections for a term not to exceed two years. This disposition was suspended and Mary was placed on probation under the following conditions: she was to cooperate in any program of rehabilitation ordered and continue psychiatric counseling, engage in the Abused Child Program and complete her GED requirements. She was placed at the Shelter pending completion of an evaluation program at Woodbridge Child Diagnostic and Treatment Center.
[3] N.J.S.A. 2C:29-5a provides that defendants guilty of "escape" must have been in "official detention."

"Official detention" means arrest, detention in any facility for custody of persons ... found to be delinquent ... or any other detention for law enforcement purposes; but "official detention" does not include supervision of probation or parole, ....
[4] Under N.J.S.A. 2A:4A-46, a juvenile involved in a family crisis (formerly JINS under N.J.S.A. 2A:4-62) can be committed to various mental health facilities and facilities for drug addicts.
[5] We need not detail here the evidence that males in a custodial setting are equally vulnerable, or the criticism leveled at the Commission and at the Model Penal Code respecting an asserted sexist bias. See Bienen, "Rape III  National Developments in Rape Reform Legislation," 6 Women's Rts.L.Rep. 170, 176 (1980).
[6] N.J.S.A. 2C:2-10c(3) also provides that "assent" is not "consent" if

[i]t is induced by force, duress or deception of a kind sought to be prevented by the law defining the offense.
[7] He also ordered that defendant never hold any other public position and imposed a $120 V.C.C.B. penalty. These conditions are not appealed from.
[8] While it is arguable that the "public trust" violation which is an aggravating factor, N.J.S.A. 2C:44-1a(4), and the element of the crime of official misconduct, N.J.S.A. 2C:30-2a, are not always synonymous, in this case we find no distinction.