823 A.2d 71 (2003)
360 N.J. Super. 346
STATE of New Jersey, Plaintiff-Respondent,
v.
Jeffrey BUSCHAM, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 13, 2003.
Decided May 28, 2003.
*74 Justin T. Loughry, Cherry Hill, argued the cause for appellant (Loughry & Lindsay, *75 Camden and Stephen M. Holden, Cherry Hill, attorneys; Mr. Loughry and Mr. Holden, of counsel and on the brief).
Analisa Sama Holmes, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General, attorney; Ms. Holmes, of counsel and on the brief).
Before Judges WEFING, WECKER and FUENTES. *72
*73 The opinion of the court was delivered by WEFING, J.A.D.
Tried to a jury, defendant was convicted of second-degree sexual assault, N.J.S.A. 2C:14-2c; first-degree aggravated sexual assault, N.J.S.A. 2C:14-2a; third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4a; and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4a. The trial court sentenced defendant to a ten-year term in prison for the first-degree conviction. All other terms were made concurrent and appropriate penalties and fines were assessed. After carefully reviewing the entire record in light of the contentions advanced on appeal, we reverse.
Defendant was thirty-one years old at the time of trial. He owned and operated a gymnastics business known as Tumbling with Spirit. Defendant is homosexual but until these charges were brought, he attempted to conceal that aspect of his life, apparently successfully. The State's theory of the case was that defendant was involved in an intimate relationship with one of his students, J.T., which developed into a ménage à trois with another student, J.G. After these charges were brought, defendant admitted his relationship with J.T., who was more than eighteen years old, but denied he had ever had an intimate relationship with J.G. Rather, he said, J.T. and J.G. had developed such a relationship between themselves.
Defendant met J.T. through the gymnastics program. J.T. began to take lessons at Tumbling with Spirit while a student at Cape May County Technical High School. He proved to be quite talented in gymnastics and competed at various national meets. He won more prizes than any other student at Tumbling with Spirit. He ceased being purely a student and began to teach as well. There was conflicting evidence introduced at trial as to J.T.'s age when defendant and J.T. began their intimate relationship. Defendant insisted J.T. was eighteen; J.T. said he was younger.
J.G., who was several years younger than J.T., was a student at the same high school. During the summer of 1999, J.G. came to the gymnastics school. He spent some period of time at the school during that summer although he was never officially enrolled there. There was conflicting evidence whether, and to what extent, J.G. participated in structured gymnastic activities during that summer period. Defendant insisted that the parents of all students who enrolled in the program execute a waiver of liability and there was trial testimony that J.G. was unable to convince his parents to sign such a waiver. Eventually, his parents did sign the waiver in December 1999 and J.G. officially enrolled thereafter.
According to the trial testimony, J.T. and J.G. had an intimate relationship beginning in June 1999 when J.G. was fifteen. J.T. told J.G. that defendant was his boyfriend and asked J.G. if he would like to participate with J.T. and defendant. J.G. agreed. According to J.G., between late June 1999 and September 1999, the three engaged in three-way sexual encounters at defendant's apartment. J.G. said he continued to engage in an intimate relationship *76 with defendant through December 1999.
Between December 1999 and January 2000, J.G. approached one of his high school teachers, Mr. Foley, and confided to him that he had been involved in a homosexual relationship with more than one person. Foley, in turn, spoke to the school nurse, who informed him that he was obligated to notify authorities. Foley returned to J.G. to tell him. J.G. then spoke to the nurse. He said he was involved in a sexual encounter with J.T. and his gymnastics coach and begged her not to tell anyone.
The nurse notified the authorities who then spoke to J.G.. The police arranged for J.G. to place a telephone call to defendant which they recorded. The conversation was extended. At various points, defendant denied there had ever been a sexual relationship between the two. He also stressed to J.G. the necessity to protect himself from diseases, both those sexually transmitted and others. Within the telephone call, J.G. spoke of an apparently intimate relationship he had with another student, Paul. The use of that telephone call, and the transcript prepared by the prosecutor, was one of the hotly-contested items at trial.
Defendant and J.T. were both arrested and indicted together on identical counts. J.T., although also charged with first- and second-degree crimes, was eventually permitted to plead to lesser charges. He testified that he pled guilty to having a sexual encounter, presumably referring to criminal sexual contact, a crime of the fourth degree, N.J.S.A. 2C:14-3b, and to third-degree endangering the welfare of a minor, N.J.S.A. 2C:24-4. He was sentenced to two and one-half years on probation, one thousand hours of community service and community supervision for life. Although there was no requirement of such in his plea bargain, J.T. testified against defendant at trial.
Defendant testified on his own behalf. He said the nature of the community and his business interests led him to maintain secrecy about his homosexuality. He admitted his relationship with J.T. but maintained he had never engaged in any sexual activity with J.G. He said he knew J.G. as a friend of J.T.'s and had become friendly with him as a result but that it never progressed any further than that. He also presented a number of character witnesses.
On appeal, defendant raises the following arguments:
I IMPROPER APPLICATION OF THE RAPE SHIELD STATUTE DEPRIVED THE DEFENSE OF FAVORABLE EVIDENCE, ALTERED THE EVIDENCE IN THE STATE'S FAVOR, AND DENIED THE DEFENDANT HIS SIXTH AMENDMENT RIGHTS
II MULTIPLE LAYERS OF PROSECUTORIAL MISCONDUCT VIOLATED THE DEFENDANT'S SIXTH AMENDMENT RIGHTS AND DIMINISHED THE JURY'S ABILITY TO ACCURATELY PERCEIVE THE EVIDENCE PRESENTED TO IT (NOT RAISED BELOW)
(a) The prosecution improperly criticized or sought to discredit and penalize defendant for exercising his Sixth Amendment rights.
(b) The prosecutor improperly denigrated and ridiculed the defendant.
(c) By improper argument, the prosecution misled the jury on its legal "duty" and responsibilities.
(d) The prosecution fostered a false impression by stressing that [J.T.] was promised nothing for his testimony against Buscham
*77 (e) Improper cross-examination of the character witnesses was an appeal to illegal and wrongful discriminatory stereotypes and prejudice, unworthy of our system of criminal justice.
III UNDER THE RUBRIC OF "FRESH COMPLAINT EVIDENCE" THE COURT ALLOWED IMPERMISSIBLE HEARSAY TESTIMONY TO BE PLACED BEFORE THE JURY (NOT RAISED BELOW)
IV INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL RESULTED IN A MISCARRIAGE OF JUSTICE FOR DEFENDANT, JEFFREY BUSCHAM
V THERE WAS INSUFFICIENT EVIDENCE PRESENTED AT TRIAL TO SUPPORT A CONVICTION OF "SUPERVISORY AUTHORITY" PURSUANT TO N.J.S.A. 2C:14-2a(2)(b).
I
We choose to deal with these contentions in an order other than that selected by defendant. We turn first to the question of "fresh complaint" testimony. During the trial, both J.G.'s teacher, Mr. Foley, and the school nurse, Ms. Hughes-Zipparo, testified about their conversations with J.G.
Mr. Foley testified that J.G. was a student of his for the 1999-2000 school year. Foley was also a minister of the Evangelical Presbyterian Church, a fact of which J.G. was aware. Foley testified that J.G. came to him between December 1999 and January 2000 to speak to him in his pastoral capacity about problems he was experiencing. Mr. Foley did not reveal any of the contents of that first conversation. J.G. returned to him in the spring. Foley was asked what J.G. said in this second conversation and he responded:
The nature of the personal problem was such that, because it was a classroom situation, that he exposed information to me that led me to believe that there may be issues that require that I disclose to theto the school administration.
Q. And what were those issues?
A. TheThe issues had to do with a personal contact with an adult and he didn't give me the name of the adult at that time.
Foley said he consulted with Ms. Hughes-Zipparo and returned to J.G., telling him that he had informed her of their conversation. He urged J.G. to speak with her or the vice-principal but J.G. did not want to, saying he cared about the people and did not want to have anyone hurt. Foley testified that J.G. never identified to him the people with whom he was involved.
Ms. Hughes-Zipparo testified later in the trial. She said that Foley approached her to discuss the obligations of a teacher who learns of "illegal sexual activities" involving a minor and an adult. She testified that a day or two after her conversation with Foley, J.G. came to her office without an appointment and said he did not want the incident reported. She continued, "then I asked him again what it was about and then he told me about a sexual encounter involving persons, used the first name, which is a former student at our school." The questioning continued:
Q. And what name did he use?
A. He just said J.T.
Q. Did he identify anybody else?
A. He said his gymnastics coach. He did not say a name at that time.
Q. Did he give you an approximate age of this person?
A. 35ish. I asked him. I actually had to ask him that question.

*78 Q. And did he tell you what type of relationship was involving these two and him?
A. That there was a sexual encounter....
Q. And what was his demeanor as he's telling you this information?
A. HeHe was very upset because he saidhe kept saying over and over again, I don't want you to report this. I don't wantI don't want to hurt anybody and in particular, you can't divulge this because my fatherI'm really worried about my father that he would kill himself. You don't understand about the Greek culture. That I can't tell my father. I'll take this to my grave if I have to.
Q. He said that to you?
A. Yes.
Q. He'd take it to his grave?
A. Yes.
In response to further questioning, she continued,
I really told him it had nothing to do with whether there was a homosexual act or a heterosexual act. It had something to do with the age, the power of the position of the person in it. That when parents send their kids to school, they send them to dance, whatever it is, that they trust the other individual involved, that there would not be this kind of encounter.
She concluded that she knew it would be difficult for him but "there may be other people involved and what makes you think that you're the only one."
Defendant contends that admission of this testimony was erroneous under the fresh complaint rule. We reject that portion of defendant's argument that rests upon the lapse of time between defendant's alleged sexual relationship with J.G. and J.G.'s discussions with the teacher and nurse. J.G. placed the termination of his sexual relationship with defendant in December 1999. Foley placed J.G.'s initial conversation with him as having occurred in either December 1999 or January 2000. The complaint must be made within a reasonable time to come within the parameters of the fresh complaint rule. State v. Hill, 121 N.J. 150, 163, 578 A.2d 370 (1990); State v. L.P., 352 N.J.Super. 369, 382, 800 A.2d 207 (App.Div.), certif. denied, 174 N.J. 546, 810 A.2d 65 (2002). His initial approach to Foley was, in our view, sufficiently close in time for purposes of the fresh complaint rule.
When fresh complaint evidence is presented, "details of the offense should be confined to those minimally necessary to identify the subject matter of the victim's complaint." State v. J.S., 222 N.J.Super. 247, 257, 536 A.2d 769 (App.Div.1988). "Only the fact of the complaint, not the details, is admissible." State v. Hill, supra, 121 N.J. at 163, 578 A.2d 370. The extent of the testimony offered by Ms. Hughes-Zipparo, however, far exceeded what should have been permitted under the rubric of fresh complaint.
The history of the development of the doctrine of fresh complaint is set forth in State v. Hill, supra, 121 N.J. at 157-63, 578 A.2d 370. Its "limited purpose [is to] negat[e] the inference that the alleged victim's failure to have confided in anyone was inconsistent with ... later claims of having been sexually assaulted." Id. at 151-52, 578 A.2d 370. Thus, the only legitimate purpose of the testimony of Foley and Hughes-Zipparo was to prevent the jury from concluding that the charged assaults did not occur because there was no testimony that J.G. had complained of them to anyone.
The fresh complaint doctrine is a common law exception to the hearsay rule. *79 It carries with it certain limitations and restrictions so as to prevent unwarranted prejudice to a defendant. In light of the rule's purpose "to prove only that the alleged victim complained [and] not to corroborate the victim's allegations.... [d]etailed testimony is impermissible under the rule." State v. Bethune, 121 N.J. 137, 146, 578 A.2d 364. In Bethune, the Court noted that "New Jersey courts have adhered strictly and uniformly to the principle of disallowing excessive details." Id. at 147, 578 A.2d 364. In our judgment, the testimony of Ms. Hughes-Zipparo went far beyond what should have been permissible under the principles of fresh complaint.
An additional protection afforded to a defendant under the fresh complaint doctrine, beyond the limited scope of permissible testimony, is the necessity of a trial court instructing the jury how to utilize fresh complaint evidence.
Trial courts should instruct the jury of the limited role that fresh-complaint evidence should play in its consideration of the case. The trial court should make clear that a fresh complaint does not bolster the victim's credibility or prove the underlying truth of the sexual assault charges but merely dispels the inference that the victim was silent.
[Bethune, supra, 121 N.J. at 148, 578 A.2d 364]
Here, however, no such limiting instruction was provided to the jury at all. They were given no indication that the testimony of Foley and Hughes-Zipparo should be analyzed or considered in any different manner than the testimony of the other witnesses who testified.
We recognize that in State v. Tirone, 64 N.J. 222, 227, 314 A.2d 601 (1974), the Court held that a failure to give a proper limiting instruction on the use of fresh complaint testimony was not plain error. We consider that case distinguishable, however. Here, in summation, the prosecutor made the following argument to the jury
And then J.G. goes down to nurse Zapparo [sic]And you know what? The one thing that gets me about this whole case I think is her demeanor on the stand. I don't know if you remember. It was last Thursday when we were in the courtroom across the hall. She was the first witness. She came in with her smock on and her emergency room pantsI don't know what to call them, but nurse's pants. There is another name for them, but if I sit here it'll take me an hour to think about it. Scrubs. Scrubs. She came in in that kind of outfit. She actually got very emotional on the stand. You could seeNow I'm not going to say that she was crying because that's a conclusion, but you could see things coming out of her eyes and down her cheek and they were wet. So youyou can make that conclusion. Because she was describing for us an event that happened ten months ago. She said she had to plead and beg this child to tell her what was going on. He didn't want to. And when she recounted itAnd I'm getting chills as I'm saying it. And when she recounted the fact that [J.G.] said to her I will take this to my grave, she paused on the witness stand to compose herself. So if [defense counsel] is trying to say that that was somehow all kind of a frame-up or something like that and [J.G.], because of the effect that it had on that nurseand she looked like a common sense kind of ordinary type of personnot coming in here for any benefit to anyone, just coming in and telling us what happened. But if [J.G.] was able to have that kind of effect on her that it's still exhibited ten months later, he deserves an Academy Award, but we all know there was *80 only one actor and one performer in this trial, only one, and it wasn't [J.G.]. So I suggest to you that nurse Zapparo [sic] and Mr. Foley provided so much support, circumstantial support for [J.G.'s] disclosure that you can believe what they say, and in turn of that you can believe what he says.
Under Bethune and Hill, however, that was precisely what the jury should have been told it could not do in considering the testimony of Foley and Hughes-Zipparo. We cannot disregard the possibility of substantial prejudice inherent in such a context and are satisfied that defendant is entitled to a new trial as a consequence.
II
We turn now to defendant's assertion that there was insufficient evidence to support his conviction of aggravated sexual assault.
Defendant was convicted of aggravated sexual assault under N.J.S.A. 2C:14-2a(2)(b), which defines the crime as an act of sexual penetration in which the victim is between the ages of thirteen and sixteen and defendant "has supervisory or disciplinary power over the victim by virtue of the actor's legal, professional, or occupational status." It was the State's theory that defendant served as J.G.'s gymnastics coach and that he held "supervisory or disciplinary power" over J.G. as a consequence of that "occupational status" sufficient to make his conduct a crime of the first degree. The trial court denied defendant's motion for a judgment of acquittal at the end of the State's case, citing State v. Reyes, 50 N.J. 454, 236 A.2d 385 (1967).
There is little reported authority in New Jersey on what constitutes "supervisory or disciplinary power" for purposes of N.J.S.A. 2C:14-2. In State v. Spann, 236 N.J.Super. 13, 563 A.2d 1145 (App.Div. 1989), aff'd 130 N.J. 484, 617 A.2d 247 (1993), we concluded that a male corrections officer who was charged with sexually assaulting a female inmate had "supervisory or disciplinary power" over her. Id. at 27, 563 A.2d 1145. In State v. Martin, 235 N.J.Super. 47, 561 A.2d 631 (App.Div. 1989), it was conceded that the male supervisor of a juvenile shelter had supervisory power over a female resident who he was charged with sexually assaulting. Id. at 51, 561 A.2d 631.
The State has marshaled case authority from across the country to support the proposition that a teacher or coach does have supervisory or disciplinary power over a student or team member for purposes of N.J.S.A. 2C:14-2. We have no quarrel with the general proposition that a coach can, indeed, be in a position to possess significant psychological or emotional power over a team member and that, in appropriate circumstances, a coach can be found to have supervisory or disciplinary power. Sports have assumed an ever-more significant role in current American culture and young people can be particularly vulnerable if they feel a need to participate in athletic endeavors. The critical question is whether this case presented such an appropriate circumstance.
The evidence in this case was ambiguous, i.e., it could support findings in either direction. Thus, the trial court properly invoked State v. Reyes, supra, to deny defendant's motion for acquittal. Although there was testimony that J.G. was present at defendant's school during a portion of the summer, there was also conflicting testimony as to whether he was involved in any gymnastic activity or merely observing J.T. There is no dispute that J.G. was not formally enrolled in any gymnastic classes until January 2000, by which time, according to his testimony, his relationship with defendant had ceased.
*81 We are troubled by the fact that although the jury was told it had to find that defendant did have supervisory or disciplinary power over J.G. in order to find him guilty of aggravated sexual assault, it was given no guidance in resolving the question whether he did, indeed, have such power. Defendant argues for an objective standard, that is, he contends the statute is intended to cover institutional activities such as organized leagues or school teams. Although the statute may most frequently be invoked in such a setting, we decline to give it such a restricted reading.
The statute, in our view, speaks to the nature of the relationship which exists between an accused defendant and an alleged victim. That a person may receive instruction in a private setting such as Tumbling with Spirit for an hour or two a week does not mean that their relationship is not so inherently unequal as to vest disciplinary or supervisory power in the instructor. The role that the activities play in the overall life of the student must be examined and analyzed. An example may suffice. A student may, for example, take pitching or batting lessons one or two hours a week in a setting wholly independent of an organized league or team to enhance the possibility of success in an organized league or team. That student may well perceive the instructor to possess disciplinary or supervisory power by threatening to withhold instruction or recommendations unless the student complies with inappropriate suggestions.
On remand, the jury must be told what factors to consider, with particular reference to the evidence presented during the course of the trial.
Depending upon the evidence presented, the jury may consider whether there was a significant disparity in ages and/or maturity level between the two; the role that the athletic activity plays in the life of the alleged victim; the extent, if any, to which the coach has offered guidance and advice to the alleged victim on questions and issues outside the athletic arena; and the power or ability of the coach to affect future athletic participation or success. We list these factors by way of example only, with no intent to exhaust the field. Counsel and the trial court may well be able to identify additional items. The jury should examine the entire context of the relationship.
III
Defendant's next argument revolves around the limitations placed upon his use of the contents of the telephone conversation between himself and J.G. which was recorded by the police. At several points within the conversation, the two alluded to a relationship which had existed between J.G. and a high school friend, Paul. Prior to jury selection, the prosecution moved to redact those portions of the conversation dealing with Paul and with J.G.'s alleged drug use. Defendant objected, arguing that defendant's references within the conversation to sexual conduct dealt with J.G.'s relationship with Paul, not J.G.'s relationship with defendant. He contended that removing those passages deprived him of the opportunity to present that explanation to the jury. Both the trial court and the prosecution noted, as they did at various points when the issue re-emerged during trial, that defendant had not made a motion under the Rape Shield Statute, N.J.S.A. 2C:14-7. Defendant responded that the prosecution's motion for redaction was his first indication that the entire conversation would not be utilized at trial.
It is clear that N.J.S.A. 2C:14-7 governs the present situation, even though *82 it was the State that was seeking to utilize the conversation in its prosecution of defendant. The statute speaks of a defendant "seek[ing] to admit such evidence for any purpose." That may occur either through a defendant's affirmative proffer or through cross-examination of a prosecution witness other than, the victim. State v. Cuni, 159 N.J. 584, 588, 733 A.2d 414 (1999). Although the Supreme Court in Cuni sanctioned the exclusion of evidence under N.J.S.A. 2C:14-7 when defendant did not comply with the statutory mandate to raise the question prior to trial, id. at 599, 733 A.2d 414, we prefer to deal with the substance of the claim, in light of the clear constitutional implications. State v. Budis, 125 N.J. 519, 530-32, 593 A.2d 784 (1991).
The purpose behind the statute is to protect a victim of sexual crimes from intrusive and potentially embarrassing expositions of past sexual activity. Cuni, supra, 159 N.J. at 600, 733 A.2d 414; Budis, supra, 125 N.J. at 539, 593 A.2d 784.
We will not burden this opinion with a line-by-line recitation of the particular passages of which defendant complains. We are troubled by certain excisions but, having reviewed the entire trial transcript, we have concluded that defendant was not improperly excluded from presenting his argument to the jury as to the meaning of the conversation. We consider ourselves bound by the Court's statement in Cuni that it is "only in situations where the relevance and probative worth of prior sexual experience are clear and substantial should the Rape Shield Law bend to the confrontation rights of the defendant." Cuni supra, 159 N.J. at 608, 733 A.2d 414 (emphasis added).
Because we have concluded that, for other reasons, defendant's convictions should be reversed, we add the following brief comment. The recording of the intercepted telephone conversation was played by the prosecution during its questioning of one of the officers who was present. It became apparent during that testimony that the transcript provided to the jury during the playing of the recording was not precisely accurate. Such matters should be attended to well in advance of trial and we assume that in the event of a retrial, there will be no repetition.
IV
We turn now to the contention of prosecutorial misconduct. Defendant makes five discrete contentions in this regard, one of which may be easily dismissed. He argues that the prosecutor attempted to mislead the jury by arguing in summation that J.T. was not promised anything in return for his guilty plea. The statement, however, is factually correct. No portion of J.T.'s plea or sentence referred in any manner to an agreement on J.T.'s part to testify against defendant. The argument was not improper. Defendant's remaining arguments require more extended consideration.
Defendant complains of several comments by the prosecutor during the course of the trial and her summation. We consider one of the remarks in summation to have been clearly an improper argument and we note it for purposes of the retrial. In concluding her summation, she told the jury it had a duty "to protect this child." Such a remark had no place in the prosecutor's summation. State v. Acker, 265 N.J.Super. 351, 356-57, 627 A.2d 170 (App.Div.), certif. denied, 134 N.J. 485, 634 A.2d 530 (1993). See also State v. Goode, 278 N.J.Super. 85, 88, 650 A.2d 393 (App. Div.1994). The jury's role was to determine whether the State had proven its case against this defendant beyond a reasonable doubt. It was not charged with *83 assuring J.G.'s safety and it should not have been implied that an acquittal would endanger him.
During the course of defendant's testimony, he was cross-examined at length about his assertion that his references within his telephone conversation to sexual activity and necessity for protection referred to J.G.'s relationship with J.T., not with him. The prosecutor picked up from defense counsel's table a transcript of that conversation, to which various "stickees" had been attached and referred to their presence in her cross-examination. Defendant clearly had the right to prepare for his trial and to consult with his attorney both in advance of and during the course of the trial. Any implication to the jury that defendant was in some way guilty because of that consultation and preparation was improper.
Further, it was improper for the prosecutor to take anything from the defense table. We recognize that there is nothing in the record that would support a conclusion that the prosecutor read any defense material or notes when she picked up this transcript. All indications are that it was a spontaneous action which did not, in fact, intrude upon defendant's consultations with his attorney. Nonetheless, the risk was there. The action was inappropriate and should not be repeated.
Defendant complains that the prosecutor questioned defendant in a manner so as to point out to the jury that he was the only witness who was present during all the testimony and was thus able to tailor his testimony accordingly. Such an argument has been criticized in State v. Eason, 138 N.J.Super. 249, 259, 350 A.2d 506 (App.Div.1975). The United States Supreme Court recently rejected a contention that such an argument violates defendant's rights under the Fifth, Sixth or Fourteenth Amendments to the United States Constitution. Portuondo v. Agard, 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000). We decline to consider whether a different result might obtain under the New Jersey Constitution for defendant has not made such a contention.
While the trial court might have been advised, in light of the comment, to instruct the jury as to a defendant's right to be present during the entire course of the trial, there was no objection to the comments and we do not consider them to rise to the level of plain error.
Defendant's final allegation of prosecutorial misconduct relates to the cross-examination of defendant's various character witnesses. The assistant prosecutor asked a number of these witnesses whether they were aware of defendant's homosexuality or the nature of his relationship with J.T.; they conceded they were not. Defendant contends this created an anti-homosexual atmosphere that was unfairly prejudicial. While one can legitimately wonder what knowledge of a person's sexual orientation adds or detracts to the ability to attest to character, State v. Campbell, 212 N.J.Super. 322, 325-26, 514 A.2d 1357 (Law Div.1986) (noting that cross-examination of a character witness should deal with material that "would ordinarily be discussed in the community."), we do not perceive any anti-homosexual bias in the questioning. The voir dire, moreover, was carefully conducted to screen out potential jurors who might have held defendant's homosexuality against him.
Defendant's remaining argument, that he was deprived of the effective assistance of counsel, is moot in light of our determination that he is entitled to a new trial.
Reversed and remanded for further proceedings.