138 N.J. Super. 249 (1975)
350 A.2d 506
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES THOMAS EASON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 9, 1975.
Decided December 29, 1975.
*252 Before Judges MATTHEWS, LORA and MORGAN.
Mr. Mark H. Friedman, Assistant Deputy Public Defender, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Daniel L. Grossman, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Lowell Espey, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by LORA, J.A.D.
Defendant was tried to a jury and found guilty of second degree murder of one Moe Cohen, guilty of illegal possession of a revolver and not guilty of atrocious assault and battery. He was sentenced to a term of 18 to 20 years on the murder charge and a concurrent term of one to two years on the weapon charge. His motion for a new trial was denied.
On appeal, defendant contends that (1) the trial judge erred by permitting defendant's wife to testify against him, (2) the prosecutor's remarks in summation were improper and highly prejudicial, (3) certain of the prosecutor's comments in summation were improper in that they were meant to penalize defendant's exercise of his constitutional right to confront the witnesses against him, (4) the trial judge erred by failing to charge voluntary manslaughter, (5) the trial judge erred by failing to advise the jury that the testimony of Albert Price should be carefully and cautiously *253 scrutinized because the State had agreed not to prosecute him for illegal possession of a weapon if he would testify against the defendant, and (6) the sentence is manifestly excessive and unduly punitive.
Shirley Eason, defendant's wife, over his objection, testified that she was working as a barmaid at Jay's Corner during the early morning of January 26, 1974. Albert Price was working with her as bartender. Shortly before closing time the owner of the tavern, Moe Cohen, came in to count the receipts. Cohen had a gun in his possession and put it near the register while he was counting the money. Defendant knocked on the door of the closed tavern and Price let defendant in. She was standing next to Cohen at the time. Defendant asked "What is going on?" and Price told him they were "trying to get out of here." Defendant then said "Come on, let's get out of here," and Mrs. Eason went into the back room to get her boots and bag, returned to the bar area and put on one of her boots.
Defendant's wife stated her husband then said she was "not working here anymore" and slapped her face. When Price asked defendant what the matter was, defendant told him to shut up, whereupon Mrs. Eason went into the ladies' room because she was embarrassed and crying. She then testified that a few seconds after she went into the ladies' room she heard a shot fired and heard Cohen say something that sounded like "Tommy, why?" Several more shots followed, but she could not estimate the time span. She was "just shaking, I guess, and I was frightened * * * I guess it was the slap and then when I heard the shots too." Following the shots, she heard the sound of bottles breaking and saw Price coming toward the ladies' room, his face full of blood, and repeating "I don't know what is wrong with this mother ____."
Price then ran to the back door and when unable to open it, ran back into the bar area. Mrs. Eason could still hear bottles breaking and heard "like a moan or something" but could not identify the voice. She squeezed into the boiler *254 room and stayed there, during which time she heard bottles breaking, the closing of the front door and the sound of a vehicle which "sounded like my husband's truck" starting. A police officer came and got her out of the boiler room. Mrs. Eason also stated she had not seen a gun in Price's hand.
On cross-examination, Mrs. Eason denied that Cohen was "fooling around with [her]" or "patting her on the rear" while she was behind the bar, although she said she might not have felt him touch her since she was wearing a "very, very heavy" skirt.
Prior to the taking of any testimony defendant objected to his wife being called as a witness. The State asserted that since the testimony would reveal that defendant had committed an assault and battery upon Mrs. Eason during the incident, causing her to become afraid, she was competent as a witness under Evid R. 23(2) (b). Defendant countered that in the absence of a municipal court complaint charging him with the disorderly persons offense against his wife alleged by the State she was incompetent to testify against him. Relying upon his interpretation of State v. Briley, 53 N.J. 498 (1969), the trial judge ruled that so long as the spouse was in fact a victim or an intended victim of the entire event, the failure of the prosecution to initiate criminal proceedings or a complaint was immaterial. At this point the prosecutor added that defendant could well have been charged with assault and battery, but it was deemed a meaningless gesture in light of the pending indictments for murder, atrocious assault and battery and possession of a firearm.
Evid. R. 23(2) (b) provides, in pertinent part, that "[t]he spouse of the accused in a criminal action shall not testify in such action * * * unless * * * the accused is charged with an offense against the spouse." In State v. Briley, supra, our Supreme Court held that this subsection justifies the rejection of the accused's claim of privilege when
* * * there is a single criminal event in which she and others are targets or victims of the husband's criminal conduct in the totality of the integrated incident and formal charges are made against the *255 husband for some or all the offenses committed (one of which charges is for an offense against the spouse), the wife should be a competent and compellable witness against her husband at the trial of all the cases regardless of whether they are tried separately or in one proceeding. And, in this connection, it should be immaterial that the offense against the wife does not reach the same dimensions of criminality as it does against the third-party victim. For example, if the offense against the wife is simple assault and battery  a disorderly person infraction cognizable in a municipal court  the fact that such a complaint is pending in that court should not destroy her competency as a witness against her husband in the trial of indictable offenses perpetrated upon the other victims of the criminal event. [at 507]
Justice Francis, speaking for the court, concluded his opinion by stating:
Thus, in view of subsection (b) of the rule, the requirement for a spouse's consent mentioned in subsection (a) must be regarded as applicable only to a criminal proceeding in which the wife's role is strictly that of a witness, as distinguished from that in which she is a victim or an intended victim, or one victim in a unitary event in which her husband is a criminal actor. [at 509]
We are of the view that Briley does not support the interpretation of the trial judge and that urged by the State. Rather, Briley indicates that while the wife's competency and compellability to testify against her husband regarding a crime committed by him against a third party may not be limited if the charges against him that relate to her are of lesser extent or are tried in a different proceeding than those relating to the third party, there must nevertheless be charges of some kind pending against the husband for the alleged crime of which the wife was a "victim." This interpretation is further indicated by the following language in Briley:
* * * in our view under the circumstances of the case Mrs. Briley would have been a competent and compellable witness in the murder case whether a charge of assault and battery upon her was instituted in the municipal court or the count for atrocious assault and battery had been severed and the murder charge tried separately. [at 504]
*256 Accordingly, Mrs. Eason should not have been permitted to testify against her husband at the murder trial since no charges related to his actions towards her were brought against him. Moreover, our review of her testimony raises serious doubts that she was a "victim or intended victim, or one victim in a unitary event" within the comprehension of Briley, supra at 509.
Nor can we agree with the State's alternative contention that Mrs. Eason's testimony outlined above was merely cumulative to that of Albert Price and Carrie Atkins and that her testimony served only to set the scene for the murder and supplied little or no inculpatory information. Besides which, no one can assess the impact of a wife testifying as a State's witness against her husband.
Defendant next complains the prosecutor's comments during summation were highly improper and prejudicial in that he used defendant's previous record of convictions, not to affect defendant's credibility but to show that defendant was the kind of man who could be expected to commit such a crime. Early in his summation the prosecutor reviewed defendant's previous record in an unobjectionable attempt to impeach his credibility. However he continued:
There is a great difference in a person's inflection of the voice. If I said to you, "Let's go," or if I said to you, "Let's get the hell out of here," and I said that with a vicious tone, and his wife complied. Maybe his wife knew the type of man that is sitting in court today, the type of man you don't talk back to. Maybe there is a reason why the defendant lists 206 Paxton Street as a mailing address. What type of husband do you think this guy is? What do you think is going through Mrs. Eason's mind when she sees this guy coming in? She has her own car there. Defendant says, "I don't know what type, what kind of money my wife makes there. I don't bother her about the money.
That is where Mr. Price assumed that the defendant was standing, and Mrs. Eason said somewhere in this area, right here, and, "My husband didn't say anything else to me. I leaned over, was starting to put on my boots, and for no reason he slapped me." "For no reason he slapped me." You know, you have to consider that statement in conjunction with the history of this man. Is he the type of boy who is compulsive? If he is the type of guy who, something is wrong in his mind, you know, is thinking 
*257 Defense counsel objected to the comment regarding the "history of this man." The trial judge allowed the comment to stand but cautioned the prosecutor that was as far as he could go "unless there was something in the evidence." Notwithstanding this admonition, the prosecutor continued in a similar vein:
Officer Tomaro said he heard a woman finally in the back room say, "Please let me out, let me out." Do you think she knew the type of man that the defendant is? Do you think she knew what the defendant was capable of doing? Do you think she knew in her mind that the defendant might have gone after her after he finished with Mr. Cohen? Defendant himself, and that, sometimes the truth has a funny way of coming out of all the lies, the defendant, when he testified, out of all the untruths that he said, the only truth he said on that witness stand was, "Yeah, I think I would have went after her. I don't think  I think I would have went in the back room if I knew she was there, and I would have went after her." Do you think you can see how justified Mrs. Eason was in staying in that back room and waiting for those police, until those police officers came?
The prosecutor then concluded with the following inflammatory remarks:
The officer said that he was covered with boxes. They could only see his chest and his head, and the defendant just casually walks out, casually walks out, hops over the bar and said, "Oh I forgot something. I forgot my wife's purse." He picks up his wife's purse and casually walks out and jumps in his van and takes off. He said he went home to wash his finger. His finger only had a superficial wound on it. I submit to you, he went home to look for his wife, to finish the job.
You have to remember that you have an obligation to decide this case on the evidence. It is not easy for you. It is not easy for me. I take no great joy in trying a case like this, and I am sure you are not getting to take any great joy in reaching a verdict, but it is your obligation. If people want the streets to be cleared of people, and their crimes, they have to return guilty verdicts. I say to you that when Mr. Cohen, when the defendant went to that tavern, for some reason he had a gun, for some reason he wanted to commit this crime. Who knows what could have transpired earlier in the day? Who knows what could have been eating away at him? Who knows, really, how much he was drinking? Who knows how much he hated Mr. Cohen for one reason or another, for anything you can speculate on?
*258 Defense counsel's objection to this last comment was sustained. At the conclusion of the prosecutor's summation defendant moved for a mistrial, objecting (among other things) to the prosecutor's repeated assertion that maybe defendant's wife knew what type of man defendant was, asserting this was an impermissible reference to defendant's prior record. The trial judge questioned the prosecutor as to whether this did not imply that Mrs. Eason was afraid because of defendant's past history of violence. While the prosecutor argued the "past history" he was referring to was as to the "relationship" between defendant and his wife, he did say he wanted to show she was hiding in the back room for her life and safety because she knew the type of man defendant was, the type of things that he was capable of doing, which supported the whole theory of his case; that he was asking the jury "to believe a lot here because, based on my case, the defendant had to be a very vicious person, a very mean person * * * and it is supported by what the wife thinks of her husband, by the fact that she is hiding in the closet." The trial judge refused to grant a mistrial but noted that he would instruct the jury to disregard the comment relating to keeping the streets free of crime. At the outset of his charge the trial judge did so instruct the jury and later gave the standard charge with respect to use of defendant's record for the purpose of impeaching defendant's credibility.
There is no doubt in our minds that the prosecutor was attempting to portray defendant as a violent and assaultive person from his prior criminal record; that defendant was the sort of man who had a propensity for committing crimes of violence and for this reason, was guilty of murder in this case. By doing so, the prosecutor circumvented the limitations on the use of prior convictions and used defendant's record to show that he was prone to committing crimes of violence, including the crime for which he was being tried. all in contravention of Evid. R. 55 and N.J.S.A. 2A:81-12. See State v. Lair, 62 N.J. 388, 391 (1973); State v. Driver, 38 N.J. 255, 292 (1962); State v. Johnson, 65 N.J. *259 388, 391-392, 394-395 (1974); State v. Spano, 64 N.J. 566, 568-569 (1974).
It is our conclusion the prosecutor exceeded the bounds of fair play in his handling of defendant's prior criminal record and that defendant did not receive a fair trial on the murder charge by virtue of the prosecutor's misconduct and the erroneous admission of the testimony of defendant's wife.
This conclusion makes it unnecessary for us to rule on defendant's remaining contentions. However, we deem it advisable to note that the prosecutor's comment that defendant was the only witness permitted to hear the testimony of the other witnesses because of the sequestration order and was thereby afforded the opportunity to tailor his testimony to meet the versions of the happenings related by previous witnesses, might better have been left unsaid in light of defendant's constitutional right to confront the witnesses against him and to be present in the courtroom at every stage of the trial. Illinois v. Allen, 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).
Notwithstanding our reversal of defendant's conviction of second degree murder, our review of the record establishes that defendant's conviction for possessing a firearm without a permit and the sentence imposed thereon must be affirmed, said sentence being neither excessive nor unduly punitive.
The judgment of conviction of second degree murder is reversed, the sentence imposed thereon vacated, and the matter remanded for a new trial of the homicide charge. The judgment of conviction of illegal possession of a weapon and the State Prison sentence of one to two years imposed thereon are affirmed.