835 A.2d 1261 (2003)
364 N.J. Super. 357
STATE of New Jersey, Plaintiff-Respondent,
v.
Ahmad DANIELS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 28, 2003.
Decided December 1, 2003.
*1263 Jay L. Wilensky, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Wilensky, of counsel and on the brief).
Jafer Aftab, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General, attorney; Mr. Aftab, of counsel and on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and PAYNE.
*1262 The opinion of the court was delivered by STERN, P.J.A.D.
Following a jury trial, defendant was found not guilty of receiving stolen property, N.J.S.A. 2C:20-7, but was convicted of robbery, N.J.S.A. 2C:15-1. He was sentenced to five years in the custody of the Commissioner of Corrections with 85% to be served before parole eligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2. The vehicle defendant was driving at the time of the stop and arrest in East Orange was the subject of the receiving count, and the purse stolen from victim Paulette Lenez in Bloomfield was the subject of the robbery. On this appeal the defendant argues that "the prosecutor committed prejudicial misconduct by unfairly besmirching the defendant's credibility on the basis of his, and counsel's, presence at trial, necessitating reversal." Defendant asserts that comment on defendant's ability to tailor his testimony in response to hearing the other witnesses was unconstitutional and, in any event, prejudicial in this case. We affirm the conviction.

I.
The testimony at trial reveals that on September 20, 2001, at around 10:00 a.m., Paulette Lenez left her home on Ashland Avenue in Bloomfield to walk to the post office. She carried her "double strap," white handbag over her shoulder. The handbag contained her glasses, identification, papers, credit cards, prepaid telephone calling cards, about $90 in cash, and "a golden watch" that was given to her on retirement, which she carried "in a little pouch" in the pocketbook.
Lenez walked past one or two houses before she felt someone "spinning" her around from behind and "grabbing" the handle of her handbag. She thereupon started screaming "very hard" for someone to help her. Lenez refused to let go of her handbag, but the assailant kept pulling it away from her. During this time a car stopped next to Lenez and the assailant. She did not see the face of the driver because she was "too upset" and just looked briefly in the direction of the car, which she first thought was stopping to help her. Finally, the straps of the handbag broke, and the assailant ran with it towards the vehicle. Lenez suffered a "big mark" and "scarring" on her arm due to the force that was used to pull the handbag away from her.
After running in the direction of the vehicle, the assailant came back towards Lenez because he dropped something. She testified:
[I] was right behind him and I start[ed] chasing him. He went to the car, the passenger seat and then he sat... I had my hands inside the car ... holding the door, mak[ing] sure it don't close. Then he pushed me back and he was just forcing me back.
When the vehicle started moving, Lenez let go, but she continued screaming. She described the car as a "very new white car," a Ford Explorer, with an American flag on it.
Carmen Alava, Lenez's neighbor on Ashland Avenue, saw Lenez walking up the street that morning. Within a few minutes Alava noticed a man, who was not *1264 "from around" the neighborhood, jogging "alongside" "a brand new jeep SUV car [that was] driving very slow." The jogger started "running a little bit faster," moved onto the sidewalk and then "snatch[ed] the purse of Miss Lenez." Alava noticed that the assailant grabbed the purse from the back and Lenez struggled with him. It was at that time that Alava "dropped everything and ran downstairs" to help, but by the time she got outside, Lenez was already walking back towards her house and she was "crying and yelling [and] very upset."
Lenez's screams were also heard by Maria Atunes, who was visiting her friend at the corner of Ashland and Linden Avenues. Atunes saw Lenez "hanging on to a white SUV" with two men inside and told her friend to call the police while she "ran outside." Atunes described the vehicle more specifically as a "brand new white SUV [with] an American flag on it." She "saw the same vehicle [she] had seen Paulette hanging onto drive around the corner." She had also seen the passenger "trying to push [Lenez] out from the car."
At about 10:05 a.m., Bloomfield police officers responded to the scene and interviewed Lenez, Alava and Atunes. Lenez described her assailant as an approximately twenty-year-old black male, about five feet eight inches in height, wearing a white t-shirt and blue jeans, with braids in his hair. Alava gave a similar description of the jogger that she saw. Atunes saw both the assailant and the driver even though they were both in the SUV at the time. She stated that the driver was in his twenties, wore a white t-shirt and had braids in his hair. Atunes' description of the assailant and his clothing was similar to that given by Lenez and Alava. Detective Edward Sousa of the Bloomfield Police Department sent out a description of the SUV through the State Police Emergency Network.
Shortly thereafter, Officer Eric Browmley of the East Orange Police Department saw a vehicle matching the SUV's description with two people inside, and turned on the overhead lights of his patrol car. Officer Browmley radioed information to headquarters about the vehicle he was chasing, and discovered that the vehicle was listed as a "stolen felony vehicle." The SUV made several "abrupt" turns before turning into a parking lot at 61 Glenwood Avenue, East Orange, where the driver pulled into a parking space. When Officer Browmley approached the vehicle, only defendant, the driver, was inside. The officer never saw the other occupant leave the vehicle. Browmley ordered defendant to get out and place his hands on the hood of the car, which defendant did, and the officer placed him under arrest for possession of the stolen SUV. Browmley also observed a purse "on the front passenger side on the floor area" of the SUV. When the officer asked defendant where the other person went, he "just didn't respond." A search of the area for the other occupant was unsuccessful.
After defendant's arrest, Browmley advised the dispatcher to notify the Bloomfield Police Department that defendant was under arrest. Shortly thereafter, Sergeant Gerald Mastroeni of the Bloomfield police transported Lenez to East Orange where she identified the white SUV. Lenez was also asked if she recognized defendant, and she said "yes, but [she] didn't know his face" because she "was fighting with the guy taking [her] pocketbook." At trial Lenez identified defendant as the person that she saw in East Orange, but she was not sure if he was the driver because she "didn't really have a chance to see" the driver.
When Lenez approached the SUV in East Orange, she identified her handbag, which was laying "between the door and *1265 the seats." After looking through her handbag, Lenez noticed that her $90 in cash, prepaid calling card and watch were missing.
Detective Sousa transported Alava and Antunes to East Orange. At the scene of the arrest, Alava identified the vehicle but she could not identify the driver because she did not see him during the incident in Bloomfield. Alava, however, stated that the defendant was not the jogger that she saw from her window. Atunes saw the SUV when she was taken to East Orange, and had "no doubt" it was the vehicle Lenez was "holding onto" on Ashland Avenue. Atunes also identified defendant as the driver of that vehicle.
At trial, Yvette Campbell of Orange testified that she was the owner of a white 2001 Ford Explorer, and that on September 18, 2001, she was "mugged" and her pocketbook, which contained her "car keys and credentials," was stolen. Campbell further testified that on September 19, 2001, she heard the alarm on her vehicle go off while it was parked in her driveway, but by the time she looked outside, it was being driven away. She identified the SUV driven by defendant at the time of arrest as her vehicle that was stolen.
Defendant testified on his own behalf. He said that on September 20, 2001 at 10:15 a.m. he was at home in East Orange, getting ready for work, when he heard a car horn. When he looked outside, he recognized a "mutual friend" of his cousin, named Mumbles, who was "waving for [him] to come downstairs." At that time the defendant was wearing a white t-shirt and blue jeans. When the defendant went downstairs he told Mumbles that he had to go to work, but Mumbles "asked [him] to drive" the car, which Mumbles identified as belonging to his mother. The defendant described the vehicle as a 2001 SUV Ford Explorer with an American flag on the antenna. He further testified that Mumbles is a black male about five feet 10 inches in height, with a short haircut, and on that day Mumbles wore a white t-shirt with blue jeans. After "[a]t the most 30 seconds," defendant agreed to drive the vehicle because it was an "opportunity to take a joyride."
The defendant got into the driver's side of the SUV and Mumbles got into the passenger side. The defendant testified that he did not see the white handbag described earlier in the trial by Lenez. He stated that he intended to drive himself to his job at Fish and Chips on Springfield Avenue, but when he arrived at Washington Terrace, Mumbles asked him to make a right turn and then a series of quick turns. He never noticed that there was a police car with flashing lights driving behind him. Finally, Mumbles asked the defendant to pull into a driveway, and as the defendant drove to the back of the lot, Mumbles "hopped out" of the vehicle and "just kept running." The defendant parked the SUV, and by the time he turned off the engine, the East Orange police officers had arrived.
The defendant further testified that the officers approached him with guns drawn and told him to "freeze" and "get down on the ground," to which he complied. He claimed that the officers handcuffed him and placed him in custody, but never told him why he was being arrested. He remained in the police car for "[a]bout an hour or so," before being taken to the East Orange headquarters where he was told he was arrested for "[s]tolen property" and was "a suspect in a purse snatch in Bloomfield." The defendant further testified that the Bloomfield police officers did not tell him why he was later being transported to Bloomfield until he arrived at Bloomfield headquarters, where he answered no questions after being given his Miranda warnings. At trial, defendant maintained *1266 that he did not drive the SUV in Bloomfield.

II.
During his summation the prosecutor stated that "defendant is trying to weave a story that acknowledges those things he can't overcome and yet exculpate himself of any kind of guilt whatsoever." The prosecutor subsequently added:
Now, the defense generally does not have to give you a story, they do not have to give you a case, they do not have to defend themselves. It is the State's obligation to provide to you proof beyond a reasonable doubt of what happened in this case. Reasonable doubt, not unreasonable doubt, reasonable doubt. But if the defendant takes the stand what he tells you is going to be subject to the same scrutiny as you hear from the State's witnesses. And let's look at what he tells you.
....
Now I said that the defendant in his testimony is subject to the same kinds of scrutiny as the State's witnesses. But just keep in mind, there is something obvious to you, I'm just restating something you already know, which is all I do in my summation, the defendant sits with counsel, listens to the entire case and he listens to each one of the State's witness[es], he knows what facts he can't get past. The fact that he was in the SUV. The fact that there's a purse in the car. The fact that a robbery happened. But he can choose to craft his version to accommodate those facts.
No objections were made to the prosecutor's remarks. Thereafter, the judge instructed the jury about the governing law in this case and the role of jurors. In particular, the judge cautioned:
You are to determine the credibility of the various witnesses, as well as what weight to attach to any particular witness' testimony. You and you alone are the sole and exclusive judges of that evidence, the credibility of the witnesses and the weight to attach to the testimony of each witness.
Regardless what counsel may have said during their closing arguments or if I say anything about the evidence, which I generally do not, keep in mind it is your recollection of the evidence that should guide you ... Any arguments, statements, remarks in the openings or summations of counsel are not evidence and must not be treated by you as evidence.
As noted at the outset, the jury found defendant guilty of robbery and acquitted him of receiving stolen property.

III.
Defendant argues that the prosecutor, in summation, attacked the defendant's credibility by adversely commenting on his constitutional right to be present at trial and implying that defendant tailored his testimony to that of the other witnesses. He contends that such a "tactic strikes at the heart of the exercise of a criminal defendant's constitutional rights" and, therefore, "is both grossly improper and highly prejudicial." Defendant further argues that the prosecutor's misconduct also warrants reversal of the conviction because the summation suggested he improperly utilized the services of counsel at his trial. On the other hand, the State contends that the prosecutor's summation constituted a proper comment on the credibility of defendant's testimony and, therefore, does not provide a basis to disturb "the justly rendered verdict in this case." The State further argues that the trial court properly "guided the jury on how to evaluate witness credibility in light of the summation."
There was no objection to the comment, and counsel's failure to raise an *1267 error at trial is usually taken to mean that counsel did not consider the alleged error to be a significant part of the trial. It also deprives the trial judge of an opportunity to cure any defect. State v. Macon, 57 N.J. 325, 333, 273 A.2d 1 (1971). Nonetheless, an issue not raised in the trial court may "in extraordinary circumstances" be considered on appeal if it meets the "plain error" standard. Ibid.; R. 2:10-2. Under the plain error standard any trial error or omission shall be disregarded by us unless it was "clearly capable of producing an unjust result." R. 2:10-2. See also State v. Bakka, 176 N.J. 533, 547-48, 826 A.2d 604 (2003). In order to be so considered, the error must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, supra, 57 N.J. at 336, 273 A.2d 1. Of course, an error of constitutional magnitude may be more likely to constitute "plain error" than any other error at trial. Id. at 341, 273 A.2d 1. See also PRESSLER, Current N.J. Court Rules, Comment R. 2:10-2 (Gann).
A defendant in a criminal trial has the constitutionally protected right to confront the witnesses appearing against him or her and to have the assistance of counsel. U.S. Const. amend. VI; N.J. Const. art I, par. 10. The right of confrontation guarantees the defendant the opportunity to hear and cross-examine government witnesses and to call defense witnesses before deciding, with the assistance of counsel, whether or not to take the stand as a witness and testify. See Brooks v. Tennessee, 406 U.S. 605, 92 S.Ct. 1891, 32 L. Ed.2d 358 (1972) (finding statute requiring defendant to testify first for the defense, or not at all, violates right against self-incrimination and due process); Illinois v. Allen, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L. Ed.2d 353, 356 (1970) (Sixth Amendment provides "right to be present in the court room at every stage of [the] trial"). Nevertheless, the United States Supreme Court has recently held it is not unconstitutional "for a prosecutor, in [his or] her summation, to call the jury's attention to the fact that the defendant had the opportunity to hear all other witnesses testify and to tailor his testimony accordingly." Portuondo v. Agard, 529 U.S. 61, 63, 120 S.Ct. 1119, 1122, 146 L. Ed.2d 47, 52 (2000).
In Portuondo the Supreme Court reversed the Second Circuit and, over Justice Ginsburg's dissent,[1] reinstated the District Court's denial of a writ of habeas corpus, which challenged a conviction for sodomy and weapons possession. Id., 529 U.S. at 63-65, 120 S.Ct. at 1121-1123, 146 L.Ed.2d at 52-53. There, the prosecutor had stated during summation:
[U]nlike all the other witnesses in this case the defendant has a benefit ... he gets to sit here and listen to the testimony of all the other witnesses before he testifies.
....
That gives you a big advantage, doesn't it. You get to sit here and think what am I going to say and how am I going to say it? How am I going to fit it into the evidence?
....
He's a smart man. I never said he was stupid ... He used everything to his advantage.
[Portuondo v. Agard, supra, 529 U.S. at 64, 120 S.Ct. at 1121, 146 L. Ed.2d at 53.]
*1268 The Court concluded that the federal constitution did not require the prosecutor to treat defendant differently from other witnesses in terms of commenting on their credibility. Id., 529 U.S. at 73, 120 S.Ct. at 1127, 146 L. Ed.2d at 58-59. When witnesses testify, their credibility can be called into question, and the same is true when a defendant takes the stand. Id., 529 U.S. at 69, 120 S.Ct. at 1125, 146 L. Ed.2d at 55-56.
Speaking through Justice Scalia, the Court held that the prosecutor's summation did not violate the Fifth, Sixth or Fourteenth Amendments to the federal constitution. According to the Court:
The defendant's right to hold the prosecution to proving its case without his assistance is not to be impaired by the jury's counting the defendant's silence at trial against himand upon request the court must instruct the jury to that effect. See Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L. Ed.2d 241 (1981). It is reasonable enough to expect a jury to comply with that instruction since, as we observed in [Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L. Ed.2d 106 (1965)], the inference of guilt from silence is not always "natural or irresistible." 380 U.S. at 615, 85 S.Ct. 1229, 14 L.Ed.2d 106. A defendant might refuse to testify simply out of fear that he will be made to look bad by clever counsel, or fear "`that his prior convictions will prejudice the jury.'" "Ibid. (quoting People v. Modesto, 62 Cal.2d 436, 453, 42 Cal.Rptr. 417, 398 P.2d 753, 763 (1965) (en banc)). By contrast, it is natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testifies last, to have in mind and weigh in the balance the fact that he heard the testimony of all those who preceded him. It is one thing (as Griffin requires) for the jury to evaluate all the other evidence in the case without giving any effect to the defendant's refusal to testify; it is something else (and quite impossible) for the jury to evaluate the credibility of the defendant's testimony while blotting out from its mind the fact that before giving the testimony the defendant had been sitting there listening to the other witnesses. Thus, the principle respondent asks us to adopt here differs from what we adopted in Griffin in one or the other of the following respects: It either prohibits inviting the jury to do what the jury is perfectly entitled to do; or it requires the jury to do what is practically impossible.
Second, Griffin prohibited comments that suggest a defendant's silence is "evidence of guilt." 380 U.S., at 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (emphasis added); see also United States v. Robinson, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L. Ed.2d 23 (1988) ("`Griffin prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt'") (quoting Baxter v. Palmigiano, 425 U.S. 308, 319, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). The prosecutor's comments in this case, by contrast, concerned respondent's credibility as a witness, and were therefore in accord with our longstanding rule that when a defendant takes the stand, "his credibility may be impeached and his testimony assailed like that of any other witness." Brown v. United States, 356 U.S. 148, 154, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). "[W]hen [a defendant] assumes the role of a witness, the rules that generally apply to other witnessesrules that serve the truth-seeking function of the trialare generally applicable to him as well." Perry v. Leeke, 488 U.S. 272, 282, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989). See also Reagan v. United States, 157 U.S. 301, 305, 15 S.Ct. 610, 39 L.Ed. 709 (1895).

*1269 [Portuondo v. Agard, 529 U.S. at 67-69, 120 S.Ct. at 1124-1125, 146 L.Ed.2d at 55-56 (footnote omitted).]
The Court concluded:
In sum, we see no reason to depart from the practice of treating testifying defendants the same as other witnesses. A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening. Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate and indeed, given the inability to sequester the defendant, sometimes essential to the central function of the trial, which is to discover the truth.
[Portuondo v. Agard, supra, 529 U.S. at 73, 120 S.Ct. at 1127, 146 L.Ed.2d at 59.]
Defendant urges us not to follow the federal precedent and to give him the greater protection frequently afforded to criminal defendants under the New Jersey Constitution. In State v. Buscham, 360 N.J.Super. 346, 366, 823 A.2d 71 (App.Div. 2003), we declined to consider that question because defendant did not raise it, and found no "plain error" with respect to a similar summation.
The New Jersey Constitution of 1947 was adopted prior to the incorporation or absorption of provisions of the federal Bill of Rights into the Fourteenth Amendment, making those rights applicable to the States. See, e.g., Mapp v. Ohio 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (Fourth Amendment); Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L. Ed.2d 653 (1964) (Fifth Amendment); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (Sixth Amendment). Our constitution in various sections provides for the citizens of New Jersey rights guaranteed in identical or similar terms as those in the Bill of Rights. Other rights are provided in different language. In either event, our Supreme Court has made clear that, in certain respects, our Constitution can and does provide greater protection for the citizens of New Jersey than the comparable provisions of the federal constitution. State v. Carty, 170 N.J. 632, 650-51, 790 A.2d 903 (2002) (articulable suspicion necessary as prerequisite to seek consent to search an automobile); State v. Cooke, 163 N.J. 657, 666-71, 751 A.2d 92 (2000) (probable cause and exigent circumstances needed to search automobile); State v. Pierce, 136 N.J. 184, 208-15, 642 A.2d 947 (1994) (search of vehicle incident to arrest for motor vehicle violation); State v. Novembrino, 105 N.J. 95, 144-47, 154-59, 519 A.2d 820 (1987) (no good faith exception to warrant requirement); State v. Alston, 88 N.J. 211, 225-30, 440 A.2d 1311 (1981) (automatic standing if charged with possession or proprietary interest); State v. Johnson, 68 N.J. 349, 353-54, 346 A.2d 66 (1975) (knowledge of right not to consent required for valid consent search). The greater protection, however, cannot flow from the feeling or whim of a judge or panel of judges. It must flow from some history, intent, or language of the drafters designed to provide for the greater protection. Where the language of our State constitution contains similar language, as Article I, paragraph 10 does regarding the Sixth Amendment, there should be some intent or historical support for the proposition that our drafters were providing something different than the drafters of the federal constitution. See, e.g., Joye v. Hunterdon Central High School, 176 N.J. 568, 607-08, 826 A.2d 624 (2003); id. at 636, 826 A.2d 624 (requiring analysis of "matters of particular state interest or local concern, state traditions, and public attitudes to determine whether a particular situation calls for greater protection *1270 under the state constitution") (La-Vecchia, J. dissenting); State v. Williams, 93 N.J. 39, 57, 459 A.2d 641 (1983); State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982); id. at 350-58, 450 A.2d 952 (Pashman, J.concurring); id. at 358-68, 450 A.2d 952 (Handler, J. concurring); Garibaldi, Remark: Conference on the Rehnquist Court: "The Rehnquist Court and State Constitutional Law," 34 Tulsa L.J. 67, 83 (1998). Where the language is different, the wording, purpose or intent of that language must be examined in detail.
Article I, paragraph 10 of the New Jersey Constitution affords the defendant the right "to be confronted with the witnesses against him" and "to have the assistance of counsel in his defense." N.J. Const., art. I, par. 10 (1947). There is nothing we are referred to, or can find, in its wording, intent or history to suggest that this paragraph of the New Jersey Constitution grants a defendant greater protection than the Sixth Amendment. See, e.g., State v. Davenport, 177 N.J. 288, 302, 827 A.2d 1063 (2003) (finding that the right to counsel under N.J. Const. art. I, par. 10 is substantially identical and co-extensive with federal constitutional rights); State v. Bey, 258 N.J.Super. 451, 466, 610 A.2d 403 (App.Div.), certif. denied, 130 N.J. 19, 611 A.2d 657 (1992) (finding federal and state constitutional rights to counsel as co-extensive); State v. Washington, 202 N.J.Super. 187, 191, 494 A.2d 335 (App.Div.1985) (finding that New Jersey protects an accused's right of confrontation by "parroting" the language of the Sixth Amendment in the state constitution). See also State v. Garron, 177 N.J. 147, 168-69, 827 A.2d 243 (2003).
In fact, long before Portuondo was decided, we found no problem with a summation that included the allegation that defendant's testimony "comported with the other stories that were presented in a way which I would point at and say it looks incredible to me. It doesn't look credible. It looks unbelievable. It looks like something fabricated." State v. Robinson, 157 N.J.Super. 118, 120, 384 A.2d 569 (App. Div.), certif. denied, 77 N.J. 484, 391 A.2d 498 (1978). In Robinson, the prosecutor also stated:
He [defendant] was sitting here while Mr. Buniak testified. Mr. Buniak told us he used a specific mortar, a specific color in making mortar ... When I asked Mr. Robinson [defendant] about that, he said he used the same color. He had the ability to sit here and listen to the other witnesses testify....
[State v. Robinson, supra, 157 N.J.Super. at 119, 384 A.2d 569.]
In reversing an order granting a new trial, we said:
We conclude that the prosecutor's comments did not in any way deprive defendant of his right to confront the witnesses against him or of his right to be present at his trial. Obviously he did confront these witnesses and was present at his trial. And a reasonable reading of the comments clearly reveals that they were a comment on the credibility of defendant's testimony. It is well settled that when a defendant waives his right to remain silent and takes the stand in his own defense, he thereby subjects himself to cross-examination as to the credibility of his story. And that issue would involve whether the story had been fabricated. State v. Kimbrough, 109 N.J.Super. 57, 67, 262 A.2d 232 (App.Div.1970); State v. Burt, 107 N.J.Super. 390, 393, 258 A.2d 711 (App. Div.1969), aff'd, o.b. 59 N.J. 156, 279 A.2d 850 (1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972). Here the issue of defendant's credibility was whether his testimony was tailored to that of the testimony of other witnesses, a perfectly proper inquiry.

*1271 [State v. Robinson, supra, 157 N.J.Super. at 120, 384 A.2d 569.]
See also, State v. Munoz, 340 N.J.Super. 204, 217-19, 774 A.2d 515 (App.Div.), certif. denied, 169 N.J. 610, 782 A.2d 427 (2001)(finding that the prosecutor's comments during summation about defense counsel's role in distorting the facts, by themselves, were not "sufficiently egregious to deprive defendant of his right to a fair trial," where the judge immediately instructed the jury to ignore the comment about the alibi being "concocted" with defense counsel). Accordingly, the mere mention of defendant's right to be present and to hear all the witnesses before he or she testified does not require reversal.
Prosecutors are "accorded considerable latitude in summing up the State's case forcefully and graphically and to pursue the prosecutorial duty with earnestness and vigor." State v. Tilghman, 345 N.J.Super. 571, 575, 786 A.2d 128 (App.Div.2001). See also State v. Munoz, supra, 340 N.J.Super. at 217-18, 774 A.2d 515. Nonetheless, they "have the overriding obligation to see that justice is fairly done," Tilghman, supra, 345 N.J.Super. at 575, 786 A.2d 128, and we are obligated to reverse a conviction based on a prosecutor's summation where the misconduct "is so egregious that it operates to deprive defendant of a fair trial." State v. Lopez, 359 N.J.Super. 222, 238, 819 A.2d 486 (App.Div.), certif. granted, 177 N.J. 576, 832 A.2d 326 (2003). To determine whether a prosecutor's comments were so prejudicial and egregious, we "must consider (1) whether defense counsel made timely and proper objections ...; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks [be] stricken from the record and instructed the jury to disregard them." Ibid. (citing State v. Frost, 158 N.J. 76, 83, 727 A.2d 1 (1999)). We will not hesitate to reverse a conviction, even on the grounds of plain error, where the prosecutor's summation crosses the line and is essentially a comment on the exercise of the right to be present at trial or on the defendant's right to hear all the testimony before taking the stand. A suggestion that the defendant or his or her counsel did something inappropriate by having defendant observe the trial or obtained some unfair advantage, before deciding what to say, warrants reversal. Cf. State v. Eason, 138 N.J.Super. 249, 259, 350 A.2d 506 (App. Div.1975) (noting, while reversing on other grounds, that a comment was "better ... left unsaid").
Here the comments were directed to defendant's credibility as a witness. They did not emphasize that defendant had an unfair advantage because he sat through the trial when others did not. Rather, the summation was truly directed at credibility and referred to the evidence at length. While it is true defendant's testimony could be read to be compatible with all the State's evidence, including his testimony that Mumbles stopped at his home for only thirty seconds which was significant in light of timing, the quoted portion of the summation must be read in context with the remainder of the summation, which included a lengthy recitation of the evidence and why defendant's version was incredible.
Once the defendant waived his right to remain silent and took the stand to testify, he subjected himself to an attack on his credibility. As in Robinson, supra, 157 N.J.Super. at 120, 384 A.2d 569, the comments were not improper because they were a general attack on credibility and did not constitute an improper or critical reference to the exercise of a constitutional right. Nor could the passing reference to the assistance of counsel be understood as a criticism of defendant or suggestion that counsel did something improper. State v. Tilghman, supra, 345 N.J.Super. at 576-78, *1272 786 A.2d 128; State v. Munoz, supra, 340 N.J.Super. at 217-19, 774 A.2d 515.
Thus, the prosecutor's comments here did not deprive defendant of his right to counsel, to be present at trial, to confrontation or to due process. Moreover, the State's case was strong, there was no objection to the summation, there is no claim that any inadmissible evidence was introduced or that, other than by virtue of the summation, there is any other basis for reversal. Finally, we note that the trial judge properly charged the jury that anything said by either attorney in summation was not evidence and should not be treated as such.
Accordingly, the judgment is affirmed.
NOTES
[1] Justice Stevens, with whom Justice Breyer concurred, joined in much of Justice Ginsburg's opinion in which Justice Souter joined. However, Justice Stevens' opinion found an insufficient basis for habeas corpus. 529 U.S. at 76-88, 120 S.Ct. at 1128-1135, 146 L.Ed.2d at 60-68.